FIFTH DIVISION
November 22, 2006

No. 1-06-0340

METROPOLITAN CONDOMINIUM )
ASSOCIATION, an Illinois Not-For-Profit )
Corporation, )
     ) Appeal from the
        Plaintiff-Appellant, ) Circuit Court of
     ) Cook County
      v. )
     )
CRESCENT HEIGHTS, d/b/a The Metropolitan )
at Sheridan, L.L.C., a Delaware Limited Liability )
Company, )
     ) Honorable
        Defendant-Appellee ) William O. Maki,
     ) Judge Presiding.
(Sudler Nagy, Inc., an Illinois Corporation, )
     )
        Defendant). )

        JUSTICE O'MARA FROSSARD delivered the opinion of the court:

        Plaintiff Metropolitan Condominium Association (the Association), which consists of

members who own condominiums at 5320 North Sheridan Road in Chicago, filed a three-count

complaint against defendant condominium developer Crescent Heights, d/b/a the Metropolitan at

Sheridan, L.L.C. (Metro), and Sudler Nagy, Inc. (Sudler), a property management company.

Count I of the Association's complaint is directed against Metro and seeks a declaratory judgment

requiring Metro to provide a "detailed accounting" pursuant to section 18.2(d)(2) of the Illinois

Condominium Property Act (Act) (765 ILCS 605/18.2(d)(2) (West 2004)). Counts II and III of

the complaint are directed against Sudler and allege breach of contract and unjust enrichment. Both of those counts were dismissed pursuant to a settlement between the Association and Sudler and are not at issue in this appeal.

Metro filed a motion for summary judgment on the declaratory judgment claim against it, and the Association in turn filed a cross-motion for summary judgment. Following a hearing at which the parties presented oral arguments, the trial court entered an order granting Metro's motion and denying the Association's motion. The Association now appeals from that order, contending that Metro had an obligation under the Act to provide a "detailed accounting" and that financial documents provided by Metro did not qualify as such. For the reasons that follow, we agree and reverse.

BACKGROUND

In 1999, Metro began a project to convert apartments at 5320 North Sheridan in Chicago into condominiums. In accordance with the Act, the board of directors representing the Association at the outset of the conversion project consisted of individuals selected by Metro. See 765 ILCS 605/18.1 (West 2004). The project culminated in transfer of control of the Association from the board of directors selected by Metro (hereinafter the developer-controlled board or developer board) to the first elected board of managers comprised of a majority of unit owners other than the developer (hereinafter the unit-owner-controlled board, unit-owner board, or owner board). This case concerns the transition period between Metro's sale of the first condominium unit in March 2000, and the election of the Association's unit-owner-controlled board in April 2001. The nature of this transition is governed by the Act, which specifies that

during the transition, "the same rights, titles, powers, privileges, trusts, duties and obligations vested in or imposed upon the board of managers by this Act and in the declaration and bylaws shall be held and performed by the developer." 765 ILCS 605/18.2(a) (West 2004). Specifically, the Act requires developers (such as Metro) to pay assessments on unsold units beginning with the first conveyance and to collect assessments from unit owners until election of the first unit-owner-controlled board. See 765 ILCS 605/9(a), 18.2(a), 18.4(d) (West 2004).

Prior to the election and formation of the first owner board at the April 2001 turnover meeting, the developer Metro exercised its limited statutory power to contract on behalf of the Association and hired Sudler to manage the property during the transition period and possibly beyond. The developer can enter a contract on behalf of the Association subject to the Association's right to cancel the contract (if it extends for more than two years from the date of the election of the owner board) upon a majority vote of the unit owners (excluding the developer) taken within 180 days of the election. See 765 ILCS 605/18.2(e) (West 2004). The contract was signed on behalf of the Association and its board of directors by Metro's president and specified that Sudler would manage the property for one year following the first unit closing and would continue month to month thereafter. After the unit-owner board took control of the Association in April 2001, it continued to engage Sudler as the Association's agent until August 2002.

In September 2003, the Association filed its complaint alleging that Metro, as the de facto manager of the Association, had a duty to maintain records concerning the construction, sale, and operation of the condominiums until the turnover meeting conducted on April 5, 2001. The

complaint alleged that within 60 days of the turnover, Metro failed to deliver to the Association, pursuant to section 18.2(d) of the Act, a series of documents, including "[a] detailed accounting by the developer, setting forth the source and nature of receipts and expenditures in connection with the management, maintenance and operation of the property and copies of all insurance policies and a list of any loans or advances to the association which are outstanding." 765 ILCS 605/18.2(d)(2) (West 2004). In its prayer for relief, the Association requested a judgment declaring that Metro was obligated to produce to these documents and pay the Association for its reasonable attorney fees and costs pursuant to section 18.2(g) of the Code (765 ILCS 605/18.2(g) (West 2004)).

Metro filed a motion for summary judgment, contending as follows:

"Sudler served as the Association's agent at all relevant times and was responsible for maintaining all records. This same agent served the Association prior to and after the election of new officers in March 2001. Plaintiff's claim against Metro LLC thus fails under well-settled principles of agency law because knowledge of an agent is imputed to the principal. As the Association was, at all relevant times, in constructive if not actual possession of all relevant documents, its attempt to pursue a claim for failure to 'turnover' documents is factually incorrect and legally unsupportable."

The Association filed its own motion for summary judgment and response in opposition to defendant's motion for summary judgment. In its response to Metro's motion for summary judgment, the Association contended that Metro's reliance on agency law was misplaced because the "information at issue is from a time when Sudler served [Metro] and not [the unit-owner-controlled] board of managers."

In its motion for summary judgment, the Association argued that the uncontroverted facts proved that Metro failed to make and provide the detailed accounting required by section 18.2(d)(2) of the Act.

The Association attached to its response and motion for summary judgment the affidavit of Michael Franz, then president of the unit-owner-controlled board of directors. That affidavit states in relevant part:

> "5. After turnover, the Association sought to determine
>
> *whether the Developer paid assessments on unsold units* and
>
> charged association accounts for other development projects.
>
> 6. As a result, on September 19, 2002, I sent a letter via
>
> certified mail, pursuant to my duties as President of the Association
>
> Board of Directors, to Developer demanding that it provide, inter
>
> alia, the detailed accounting required by Section 18.2(d) of the
>
> Illinois Condominium Act. ***
>
> 7. Developer has failed to provide the 'detailed accounting'
>
> as requested and required by the statute.

5

> 8. *Without the 'detailed accounting,' the Association is*
>
> *unable to determine whether the Developer paid assessments on*
>
> *unsold units* and charged association accounts for other
>
> development projects."  (Emphasis added.)

Metro filed a "Reply in further Support of its Motion for Summary Judgment and Response to Plaintiff's Cross-Motion for Summary Judgment," contending that the Association "did receive detailed financial reporting that included a breakdown of every aspect of its financial activity."  In support of its reply, Metro attached samples of financial reports from 2000, 2001, and 2002.  According to Metro, the reports include a monthly balance sheet identifying: (a) the Association's operating and reserve funds, liabilities, and balances; (b) the statement of operations and budget comparisons identifying monthly income and expenses; and (c) the general ledger identifying each specific journal entry (down to the detail of payments for janitor's supplies and window washing fees).

The Association, in turn, filed a reply in support of its motion for summary judgment, contending that "any detailed account for the pre-turnover period should include a breakdown of which units were sold, when they were sold, what assessments were paid for each unit, when the assessments were paid, and whether Developer properly paid assessments for all units during the period prior to the initial sale."  The Association contended in its reply that Metro never provided it with this information, but instead provided documents which simply gave total assessments received, without any information regarding payments (or nonpayments) for specific units.

6

The trial court conducted a hearing on the parties' summary judgment motions in January 2006. The record on appeal does not include a transcript of that hearing, a bystander's report, or an agreed statement of facts. Following the hearing, the trial court entered a written order granting Metro's motion and denying the Association's motion. The order reflects that counsel presented oral arguments at the hearing but does not indicate that any new evidence was presented at the hearing in support of or in opposition to the subject motions.

The Association filed its notice of appeal on February 3, 2006. The notice states that the Association "hereby appeals the judgment entered against it on January 5, 2006, granting [defendant] summary judgment on count I." The notice further states that the Association "requests that the appellate court reverse the circuit court's order granting [Metro] summary judgment on count I of [the Association's] verified complaint, vacate the judgment entered in favor of [Metro], and remand the matter to the circuit court for further proceedings." The notice does not expressly state that the Association was appealing or seeking reversal of the portion of the trial court's order which denied its cross-motion for summary judgment.

## ANALYSIS

The Association contends on appeal that the trial court's order denying its motion for summary judgment and granting summary judgment in favor of Metro must be reversed because Metro failed to provide it with a "detailed accounting" pursuant to section 18.2(d)(2) of the Act. 765 ILCS 605/18.2(d)(2) (West 2004). Metro responds that the trial court's order must be affirmed because it did provide the Association with a "detailed accounting" and, alternatively, because the Association already had constructive knowledge of all the relevant financial

7

documents by virtue of its employment of Sudler as its property manager (i.e., as its agent).

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 102 (1992). In reviewing a motion for summary judgment, the trial court is required to consider affidavits, depositions, admissions, exhibits, and pleadings on file and to construe them strictly against the moving party and liberally in favor of the nonmoving party. In re Estate of Hoover, 155 Ill. 2d 402, 410-11 (1993). We apply de novo review to orders granting summary judgment. In re Estate of Hoover, 155 Ill. 2d at 411.

The primary issues before us are (1) whether the relevant undisputed facts establish as a matter of law that Metro provided the Association with a "detailed accounting" pursuant to section 18.2(d)(2) of the Act, and (2) if not, whether Sudler's status as the Association's agent relieved Metro of its obligation to provide such an accounting. Before reviewing these issues, we address two preliminary matters raised by Metro.

## I. Preliminary Matters

In its appellate briefs, the Association requests that we enter summary judgment in its favor even though its notice of appeal did not specify that it was appealing the denial of its motion for summary judgment. Metro argues that the Association's failure to specify in its notice of appeal that it was appealing the denial of its summary judgment motion precludes us from granting the relief requested by the Association in its briefs. We disagree.

"[A] notice of appeal is to be liberally construed" and will confer jurisdiction on an appellate court if, when considered as a whole, it "fairly and adequately sets out the judgment

8

complained of and the relief sought so that the successful party is advised of the nature of the appeal." Burtell v. First Charter Service Corp., 76 Ill. 2d 427, 433-34 (1979). "Unless the appellee is prejudiced thereby, the absence of strict technical compliance with the form of the notice is not fatal, and where the deficiency in the notice is one of form only, and not of substance, the appellate court is not deprived of jurisdiction." Burtell, 76 Ill. 2d at 434.

The notice of appeal in the instant case identifies the order appealed from, specifying that it granted summary judgment in favor of Metro. We recognize that the notice does not specify that the order appealed from also denied the Association's motion for summary judgment. Furthermore, we recognize that the notice does not expressly seek reversal of that denial. Despite these omissions, we find that the notice fairly and adequately advised Metro of the nature of the appeal. The parties' cross-motions for summary judgment clearly addressed the same legal issues, and thus, appealing the grant of one of the motions was essentially the same thing as appealing the denial of the other. Metro does not assert that it was prejudiced by the Association's notice of appeal, and we find no basis for concluding that Metro's ability to defend itself on appeal was in any way compromised or prejudiced by the formal, nonsubstantive defects in the Association's notice of appeal.

In addition to challenging the sufficiency of the notice of appeal, Metro argues that the record on appeal is incomplete and that we should therefore resolve this appeal against the Association, the appellant in the instant case. Metro contends that we cannot review the instant appeal because the Association failed to present an adequate record of the proceedings in the trial court. Specifically, Metro points out that the Association failed to provide a transcript,

9

bystander's report, or other record of the summary judgment hearing. We reject Metro's contention.

The absence of a transcript of proceedings in the trial court does not bar review of an appeal by this court when the issue on appeal is solely a question of law and does not involve evidentiary issues. Korogluyan v. Chicago Title & Trust Co., 213 Ill. App. 3d 622, 627-28 (1991). The instant appeal requires us to review whether the financial documents provided by Metro to the Association qualified as a "detailed accounting" under the Act and, if not, whether agency principles relieved Metro of its obligation to provide such an accounting. The facts relevant to the legal issues now before us are undisputed. Accordingly, we conclude that the record on appeal is sufficiently complete for us to address the arguments raised on appeal by the Association.

## II. "Detailed Accounting" Under Section 18.2(d)(2)

The first substantive issue before us is whether the relevant undisputed facts establish as a matter of law that the financial documents which Metro provided the Association constituted a "detailed accounting" pursuant to section 18.2(d)(2) of the Act.

The Association contends that "[a]ny detailed accounting for the pre-turnover period should at the very least include a breakdown of which units were sold, when they were sold, what assessments were paid for each unit, when the assessments were paid, and whether Defendant properly paid assessments for all units during the period prior to the initial sale." Such information, the Association argues, provides the only avenue for a unit-owner board of managers to determine whether a developer properly fulfilled its statutory pre-turnover financial obligations.

10

In the instant case, the Association emphasizes, Metro did not provide this information to it.

Metro responds that it was not required to provide the Association with such information because "it is not what the statute says" and contends that the Association has improperly "attempt[ed] to add language that is not contained in the statute." In support of its position, Metro quotes section 18.2(d)(2) of the Act, but does not address the meaning of the language within the provision itself.

The issue at hand calls upon us to construe section 18.2(d)(2) of the Act and determine whether Metro has satisfied its duty to provide a "detailed accounting" under that provision. "The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature." Midstate Siding & Window Co. v. Rogers, 204 Ill. 2d 314, 320 (2003). "To do so, we examine the language of the statute, the most reliable indicator of the legislature's objectives in enacting the law." Rogers, 204 Ill. 2d at 320. "We afford the language of the statute its plain and ordinary meaning [citation] and construe the statute as a whole." Rogers, 204 Ill. 2d at 320. "Words and phrases must not be viewed in isolation but must be considered in light of other relevant provisions of the statute." Rogers, 204 Ill. 2d at 320. "We also presume that in enacting the statute the legislature did not intend absurdity, inconvenience, or injustice." Rogers, 204 Ill. 2d at 320.

Section 18.2(d)(2) of the Condominium Property Act states:

> "Within 60 days following the election of the first unit
> owner board of managers, the developer shall deliver to the board
> of managers:

\*\*\*

(2) A detailed accounting by the developer, setting

forth the source and nature of receipts and expenditures in

connection with the management, maintenance and

operation of the property and copies of all insurance policies

and a list of any loans or advances to the association which

are outstanding." 765 ILCS 605/18.2(d)(2) (West 2004).

"The purpose of this requirement is to insure that the developer does not commingle funds received from the sales of units with money collected and used for the operation of the association." M. Pearlstein, *Condominium Management*, in Illinois Condominium Law §4.4 (Ill. Inst. for Cont. Legal Educ. 2000).

The plain language of section 18.2(d)(2) of the Act requires the developer to deliver to the unit-owner board of managers, inter alia, a "detailed accounting providing the source and nature of receipts in connection with the management, maintenance and operation of the property." The Act does not include a definition of either "accounting" or "receipts," and our research reveals no Illinois case construing these terms under section 18.2(d)(2) of the Act. Accordingly, we look to the plain and ordinary meaning of those terms. See Gem Electronics of Monmouth, Inc. v. Department of Revenue, 183 Ill. 2d 470, 477-78 (1998) (noting that "[u]ndefined terms in a statute must be ascribed their ordinary and popularly understood meaning").

Webster's Third New International Dictionary defines "accounting" as "the system of classifying, recording, and summarizing business and financial transactions in books of account and analyzing, verifying, and reporting the results." Webster's Third New International Dictionary 13 (1986). An accounting thus consists of reported results that classify, record, and summarize business and financial transactions. Furthermore, these results should provide enough detail so that any summary of information within them can be verified by looking first to the subject transaction which has been recorded in the accounting itself and then to the underlying records to confirm the accuracy of the recording.

Webster's Third New International Dictionary defines "receipt" as "a writing acknowledging the taking or receiving of goods or money delivered or paid." Webster's Third New International Dictionary 1894 (1986). Thus, receipts received "in connection with the management, maintenance and operation of the [subject] property" would include written records reflecting money received by Metro for the sale of condominium units as well as assessments received by Metro for the maintenance of the property at 5320 N. Sheridan. Furthermore, the "source" and "nature" of such receipts (which section 18.2(d)(2) requires the developer to provide) would include (1) the dates on which individual units at 5320 N. Sheridan were sold, (2) the assessments paid for each individual unit, and (3) the dates on which those assessments were paid.

In the instant case, Metro does not suggest that the documents it has provided to the Association include this information. Indeed, a review of the documents included in the record on appeal reflects that while they list the total amount of assessment income received, they do

13

not provide (1) the dates on which individual units were sold, (2) the assessments paid for each individual unit commencing on the date of the sale of the first unit, and (3) the dates on which those assessments were paid. We hold, based upon the above-discussed plain language, that a "detailed accounting" under section 18.2(d)(2) of the Act must include such information.

We note that our holding today is consistent with the purpose underlying section 18.2(d)(2). That purpose, as previously noted, is to insure that prior to the turnover of control of the Association to the first owner board, the developer does not commingle funds received from the sales of units with money collected on behalf of the Association. M. Pearlstein, *Condominium Management*, in Illinois Condominium Law §4.4 (Ill. Inst. for Cont. Legal Educ. 2000). Or, stated another way, the purpose of section 18.2(d)(2) is to facilitate the ability of unit owners (other than the developer) to verify that the developer has complied with its duty under section 9(a) of the Code to pay assessments on unsold units commencing on the date of the sale of the first unit and complied with its duty under sections 18.2(a) and 18.4(d) of the Code to collect assessments from unit owners until election of the first unit-owner board. See 765 ILCS 605/9(a), 18.2(a), 18.4(d) (West 2004). Construing section 18.2(d)(2)'s "detailed accounting" to include (1) the dates on which individual units were sold, (2) the assessments paid for each individual unit, and (3) the dates on which those assessments were paid does facilitate unit owners' ability to verify that the developer has complied with its statutory obligations with respect to the payment and collection of assessments.

In addition to arguing that the documentation which it provided to the Association requires us to affirm the trial court's order granting it summary judgment, Metro argues that the

trial court's order must be affirmed because "[the Association's] response and cross-motion in the underlying proceedings did nothing more than assert that no 'detailed accounting' was made without pointing to any specific information that was missing from the documents it already had."  We recognize that it is incumbent upon unit owner boards to make clear to developers what sort of information they believe to be missing from documents initially produced by developers pursuant to their statutory duty to provide a detailed accounting.  In the instant case, however, we note that the Association did indicate the type of information it believed was missing from the documents provided by Metro.  The Association attached to its response and motion for summary judgment the affidavit of Michael Franz, then president of the unit-owner board.  In that affidavit, Franz stated that the Association was seeking a "detailed accounting" in order to determine "whether [Metro] paid assessments on unsold units."  In addition, in its reply in support of its motion for summary judgment, the Association specified that "any detailed account for the pre-turnover period should include a breakdown of which units were sold, when they were sold, what assessments were paid for each unit, when the assessments were paid, and whether [Metro] properly paid assessments for all units during the period prior to the initial sale."  Thus, contrary to Metro's assertion, the Association did identify specific information that was missing from the documents it already had.

### III.  Agency

Metro alternatively contends that it was not required to provide the Association with a detailed accounting because the Association already had constructive knowledge of all the relevant financial documents pursuant to principles of agency.  Specifically, Metro contends that

the Association is deemed to know everything that its agent knows (see <u>Kuska v. Folkes</u>, 73 Ill. App. 3d 540, 544 (1979)) and Sudler, the Association's agent, knew everything that any accounting could provide because it managed the subject property and maintained the financial information in question during the relevant time period.

Metro's argument relies on the premise that the Association, which employed Sudler as its agent before the turnover, continued to exist as essentially the same entity with the same interests following the turnover. We reject this premise as it disregards the fact that the composition of the board representing the Association (and thus the Association itself) fundamentally changed upon the turnover. Before the turnover, Metro controlled the board of directors representing the Association and, on behalf of the Association, entered into a contract with Sudler to manage the property. At that time, Metro was not simply responsible for managing the property. Rather, as the developer of the property, it also had an interest in selling the remaining units. Following the turnover, control of the board representing the Association responsible for managing the property transferred from Metro to the first unit owners other than Metro. These unit owners, unlike Metro, were not in the business of converting the property in which they lived and presumably did not have an interest in immediately selling the units that they owned. Thus, the entity on whose behalf Sudler served as an agent prior to the turnover was not the same entity on whose behalf it served following the turnover. In short, prior to the turnover, Sudler effectively served as Metro's agent and not as the agent of the unit owners comprising the board of managers following the turnover. Indeed, the first unit-owner-controlled board of managers did not even exist during the time period for which the Association now seeks an

16

accounting. Accordingly, we conclude the Association represented by the post-turnover unit-owner board of managers cannot be deemed to have knowledge of financial records maintained by Sudler on behalf of the pre-turnover Association, which was represented by the developer-controlled board.

In recognition that the composition and interests of condominium associations fundamentally change upon the turnover, the Act imposes an affirmative duty on a developer to provide to the first unit-owner-controlled board certain documents and financial information which the developer-controlled board is responsible for maintaining prior to the turnover. See 765 ILCS 605/18.2 (West 2004). The purpose of the "detailed accounting" requirement included in section 18.2(d)(2) of the Act, as previously discussed, is to ensure that unit-owner-controlled boards are able to obtain the documents and information necessary to verify that the developer properly handled condominium-related financial affairs prior to turnover. Construing section 18.2(d)(2) to exempt a developer from complying with this statutory duty whenever a unit-owner-controlled board retains a property manager initially hired by a developer-controlled board would undermine this purpose. Specifically, such a construction would threaten the ability of unit- owner-controlled boards to obtain detailed accountings by forcing them to attempt to retrieve the relevant underlying financial information from property managers who were not acting directly on their behalf at the time they were gathering and maintaining that information. Placing such an onus on unit-owner boards was not the intent of the legislature when it enacted section 18.2(d)(2), and accordingly, we reject Metro's contention that agency principles effectively exempted it from providing the Association with a detailed accounting.

CONCLUSION

For the reasons previously discussed, we conclude that Metro did not satisfy its obligation to provide the Association with a detailed accounting under section 18.2(d)(2) of the Act and conclude that no reasons exist relieving it of its obligation to do so. Accordingly, we reverse the trial court's order granting summary judgment on behalf of Metro and denying summary judgment to the Association and remand for a determination of attorney fees to be awarded to the Association.

Reversed and remanded.

O'BRIEN, P.J., and GALLAGHER, J., concur.